UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CECELIA DEBORAH ANN FORTIER,<br><br>Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL,<br><br>Defendant. | Case No. 16-cv-07073-EDL<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 24, , 30 |

Plaintiff Cecilia Fortier and Defendant Acting Commissioner of Social Security both moved for summary judgment in this social security appeal. Plaintiff argues that the Administrative Law Judge ("ALJ") erred because the ALJ improperly rejected the opinions and testimony of several doctors and Plaintiff's therapist. Because the ALJ failed to provide clear and convincing reasons for rejecting those opinions, the Court **REMANDS** for further proceedings.

## I.    BACKGROUND

Plaintiff Cecelia Deborah Ann Fortier was born in 1980. AR 205. She attended special education from 1986 to 1995. AR 244. She also completed two years of college. AR 244. She has some training and education for emergency medical technician ("EMT"), criminal justice, hazardous material handling and disposal, and "Rig safety training CPR Rig Pass." AR 244. She alleges disability based on combined mental and physical impairments, including cervical spine degenerative disc disease, irritable bowel syndrome, asthma, affective disorders, attention deficit hyperactivity disorder, post-traumatic stress disorder ("PTSD"), and personality disorder.

## II.    PROCEDURAL BACKGROUND

On September 21, 2012, Plaintiff filed for Social Security Disability Insurance Benefits. AR 205-06. On September 25, 2012, she filed for Supplemental Security Income disability

United States District Court
Northern District of California

benefits. AR 207-15. On May 24, 2013, the claims were initially denied. AR 20. On September 5, 2013, the claims were denied upon reconsideration. AR 20.

On October 1, 2014, an ALJ held a hearing on Plaintiff's claims. The ALJ held the record open following the hearing to allow Plaintiff to submit additional argument. AR 20. On May 20, 2015, the ALJ issued a decision finding that Plaintiff was not disabled. AR 33. Plaintiff requested review of the ALJ's decision by the Appeals Council, and submitted argument and additional evidence. AR 15, AR 375-81. The Appeals Council declined to grant the request for review but "looked at medical records" that Plaintiff had submitted with the appeal. AR 1-2. The Appeals Council stated that the records did not affect the decision about whether Plaintiff was disabled as of May 20, 2015, because they were "information about a later time." AR 2. Plaintiff now seeks judicial review of the decision that she is not disabled.

## III. EVIDENCE AT THE HEARING

### A. Plaintiff's Evidence

A social worker helped Plaintiff fill out a disability report in October 2012. AR 252. At that time, Plaintiff was homeless and was not on any of her prescribed medications, except for her asthma medication. AR 252. In that report, Plaintiff stated that she had stopped working on April 20, 2010. AR 244. She stated that she stopped working because of her conditions and because her sister, for whom she had been working, had moved out of state. AR 244. The social worker included additional information at the end of the disability report, stating that Plaintiff had been unclear about all the dates of employment and pay. AR 252.

On the same day, Plaintiff completed a work history report.[1] AR 231-41. She listed work as a bartender from May 2010 to October 2011 and as a horse riding instruction from January 2009 to July 2012. AR 231. She also had experience as a lab assistant, a personal assistant, and a phlebotomist. AR 231. She listed that, as a bartender, she earned $680 per month and worked nine hours per day, six days per week. AR 232. She did not fill out any other details about the responsibilities of her position. AR 232. She listed that, as a horse riding instructor, she earned

---

[1] It appears but is not explicitly stated that the social worker also helped Plaintiff complete the work history report.

1   $650 a month and worked ten hours per day, six days per week. AR 233. She did not fill out any

2   other details about the responsibilities of her position. AR 232.

3         Plaintiff also completed an adult function report. AR 305-13. She stated that she lived

4   with her fiancé and caregiver. AR 305. She stated that her conditions limited her ability to work

5   because she had panic attacks that made her unable to cope with stress or conflict; social anxiety

6   which made her unable to maintain a schedule or sleep pattern; night terrors; emotional outburst;

7   severe depression; body pain and joint swelling; vomiting up to six times a day; diarrhea from 12-

8   20 times a day; and was unable to bend her left knee, had muscle rigidity and spasms, ongoing

9   PTSD symptoms, and loss of strength in her limbs. AR 305.

10        Her daily activities included vomiting several times, taking cannabis, eating, napping,

11  watching television, feeding her dogs, and letting the dogs in from the yard. AR 306. She stated

12  that, before her illness, her daily activities had included typing, riding horses, working, having

13  sex, sleeping, having personal relationships and friends, driving, and caring for her animals and

14  children. AR 306. Once a week she went to domestic violence class counseling for an hour. AR

15  306. She did not provide care for anyone else. AR 306. She stated that her roommate helped her

16  by driving her everywhere. AR 306. Although able to shave, dress, use the toilet, and care for her

17  hair herself, she needed to use a chair or have someone with her when she bathed, or else she

18  would fall. AR 306. She needed reminders to bathe, brush her teeth, eat, and take her

19  medications. AR 307.

20        She prepared her own meals about twice a week, but hardly cooked at all due to joint pain

21  and the fact that she would get dizzy if she stood for too long. AR 307. She did laundry and

22  sweeping once a week and dusting once a month. AR 307. She also helped with the dishes. AR

23  307. To do these chores, she needed moral support and encouragement from her roommate. AR

24  307. She did not do more house or yard work because of pain, anxiety, joint pain, and muscle

25  rigidity. AR 308.

26        Plaintiff went outside on average four times a week, to counseling and doctor's

27  appointments. AR 308. Severe panic attacks, confusion, anxiety, and fear prevented her from

28  going out alone. AR 308. She did not drive for emotional and physical reasons. AR 308. She

                                        3

could count change but otherwise did not handle finances, including paying bills, having a savings account, or a checking account because she could not focus long enough, would forget, and had anxiety about having no money. AR 308. Before the onset of her alleged disability, she used to do accounts payable and receivable, and had handled her accounts as a horse trainer when she was self-employed. AR 309.

Before, Plaintiff's hobbies included hiking, horseback riding, biking, movies, and racquetball. AR 308. After her conditioned worsened her hobbies changed to movies, reading, and astronomy. AR 308. On a regular basis, Plaintiff visited her children, went to therapy, went to clinics and doctors, and attended domestic violence counseling. AR 309. Plaintiff needed reminders for these outings. AR 309. She had trouble getting along with family, friends, neighbors, and others because she had no tolerance for stress. AR 310. She would lock herself in the bathroom anytime anyone yelled. AR 310.

Plaintiff stated that her joint pain, anxiety, and muscle rigidity affected her ability to do physical activities including lifting, walking, climbing stairs, squatting, sitting, kneeling, and using her hands. AR 310. They also affected her memory, concentration, understanding, speech, hearing, and abilities to complete tasks, get along with others, and follow instructions. AR 310. Plaintiff could only walk for five to ten minutes at a time before she needed a rest. She could not follow written instructions because they frustrated her. AR 310. She could not follow spoken instructions well because she would usually complete things backwards, if at all, and would walk out of a room to get something and instantly forget what she was going to get. AR 310. She was terrified of authority figures, could not handle stress at all, and could not handle changes in her routine. AR 311. She had to wear orthopedic shoes when walking longer than a quarter mile. AR 311. Plaintiff took medicine for vomiting, anxiety, diarrhea, blurry vision, muscle rigidity, nausea, restlessness, and shakiness. AR 312.

At the hearing, the ALJ asked Plaintiff about her work as a bartender and horseback riding instructor. AR 45. Plaintiff could not confirm with certainty the dates that she had listed for her work as a bartender, but stated that they "sound[ed] right." AR 45. She agreed that she was working as a horseback riding instructor in 2009 and 2012. AR 46. She testified that she had

4

some trouble doing both of these jobs because she had panic attacks, a loss of strength, and stress interfered. AR 46.

Plaintiff testified that some days she tried to get her children's homework together but often she would just be in bed and her significant other, David Rembert, would take care of everything. AR 51-52. On days that she stayed in bed all day it was because she could not get out of bed due to fear, anxiety, or pain. AR 51. At the time of the hearing, she would stay in bed on average three days a week, but earlier, she averaged about five days a week. AR 52. Except at night, she needed all the doors, including the front door, to be open. AR 52. Plaintiff would accompany Rembert to the grocery store, but often go and sit in the car when they were in line, because she did not like to be close to people. AR 51. She did not like to answer the phone. AR 53. In 2010, her condition was significantly worse, causing her to give her children to her cousin and her sons to their father. AR 53. She had passed out several times for unknown reasons. AR 54. She had carpal tunnel syndrome in her hands or wrists, for which she wore braces. AR 54-55.

In response to the ALJ's question whether her physical or mental problems affect her the most, she answered:

> I think it's the combination of both. I don't think one necessarily - -I think the one -- it's a big cycle. I think the one affects the other and back and forth. So, like, my fear makes me want to hide. So when I'm not able to get out of bed, then that causes the fibromyalgia to get so much worse because I'm not moving. And then the pain increases and then it gets even harder to get out of bed. So that's where the days and days come in where I'm just in bed. I'm not useful for anyone. And it's very frustrating.

AR 56. Rembert confirmed Plaintiff's testimony about her staying in bed, needing the doors open, having little involvement in the housework, and having few social activities.

### B. Dr. Tania Shertock, Examining Psychologist

The Department of Social Services ("Department") referred Plaintiff to Dr. Tania Shertock, Ph.D. for a psychological examination. AR 551. Dr. Shertock's sources were Plaintiff and records from Touchstone Counseling Services, provided by Mary Holbrook, MFT. AT 551. On April 16, 2013, Dr. Shertock administered four tests to Plaintiff, the Wechsler Adult Intelligence Scale-IV ("WAIS-IV"), Wechsler Memory Scale-IV ("WMS-IV"), Trails A, and Trails B. AR 551. Dr. Shertock determined that Plaintiff had an IQ of 72, which placed her in the

borderline range. AR 553. Plaintiff's WMS-IV scores placed her in the extremely low range. AR 553. Her Trails A and B results suggested "dysfunction in visual scanning, psychomotor speed, or focusing and shifting attention." AR 553. Dr. Shertock discontinued the Trails B test due to Plaintiff's inability to follow the sequence of the tasks. AR 553.

Dr. Shertock provided a functional assessment but noted that her findings were based on one time-limited mental status evaluation and that the sections of the report titled "History of Present Illness" and "Present Level of Functioning" were based on Plaintiff's self-reports. AR 554. She noted that Plaintiff presented as a "reliable historian." AR 554. Based on Plaintiff's "clinical presentation, and her history and symptoms," Dr. Shertock determined that Plaintiff appeared to meet the criteria for a diagnosis of PTSD, ADHD, Major Depression and cognitive disorders from brain trauma. AR 554. Based on Plaintiff's "vocabulary, grammar and syntax," Dr. Shertock determined that Plaintiff appeared to be functioning in the "borderline range." AR 554.

Dr. Shertock opined that Plaintiff was capable of understanding, remembering, and carrying out simple instructions. AR 554. She opined that Plaintiff had moderate impairments in understanding, remembering, and carrying out complex instructions, maintaining attention and concentration for the duration of the evaluation, maintaining adequate pace while completing tasks, withstanding the stress of an eight hour day, maintaining adequate persistence while completing tasks, and enduring the stress of the interview. AR 554. She opined that Plaintiff had a marked impairment in ability to adapt to changes in routine work-related settings. AR 554. Dr. Shertock noted that Plaintiff was able to interact appropriately with her but that, based on Plaintiff's reported history, her "ability to interact with the public, supervisors, and coworkers" appeared questionable. AR 554. She diagnosed Plaintiff with histrionic personality disorder, major depressive disorder, R/O Cognitive Disorder, Attention-Deficit Hyperactivity Disorder-Inattentive Type, and Posttraumatic Stress Disorder. AR 554.

### C.    Dr. Leslie Tsang, Treating Psychiatrist[2]

On July 22, 2014, Dr. Leslie Tsang, Plaintiff's treating psychiatrist, completed a "mental capacities" evaluation so that California's Department of Health and Human Services could determine Plaintiff's eligibility for public assistance. AR 689. Dr. Tsang checked boxes indicating that Plaintiff had a medically verifiable condition that would limit or prevent her from performing certain tasks, that the condition was chronic, that the onset of the condition was 2008, that Plaintiff was actively seeking treatment, that Plaintiff was unable to work, and that Plaintiff had limitations that affected her ability to work or participate in education or training. AR 689. Dr. Tsang also opined that Plaintiff was unable to complete "daily work, training and/or educational activities" independently and without prompting. AR 688. He opined, "anxiety and panic attacks significantly limit [Plaintiff's] social interactions and effective communications," her ability to complete tasks was "[i]mpaired due to severity of symptoms," and that her ability to adapt to work or work-like situations was, "significantly limited" because her "symptoms interfere[d] with judgment, decisions, adapting to change, and her own activities of daily living." AR 688.

### D.    Mary Holbrook, Former Treating Psychotherapy Counselor, MFT

In February 2013, Mary Holbrook submitted a summary and report of her treatment and diagnosis of Plaintiff. AR 446. Holbrook saw Plaintiff as a psychotherapy client from October 21, 2010, to November 16, 2011, for a total of 23 weekly one-hour sessions. AR 446. Plaintiff returned to Holbrook in December 2012, and saw Holbrook once a month, on December 13, 2012, January 17, 2013, and February 14, 2013. AR 446. Holbrook's report also summarized Plaintiff's self-reported history, including descriptions of how Plaintiff was raised in a cult-like religion, from which her family eventually withdrew, and how Plaintiff suffered years of abuse from her ex-husband, including being "beaten and raped, severely controlled, and stalked after

---

[2] Dr. Tsang also completed a medical source statement, in which he found that Plaintiff had severe limitations in every work area and opined that she was be unable to work. Pltf. Ex. A at 1-5. Because Dr. Tsang completed this report in August 2015, it was not before the ALJ. Plaintiff submitted it to the Appeals Council, but the Appeals Council did not incorporate it into the record for review on appeal. See Section IX below, regarding Additional Evidence Submitted to Appeals Council.

separation." AR 447.  Holbrook stated that Plaintiff had improved somewhat "since being in her current relationship and being on her present medications" but that "all her symptoms remain[ed] evident."  AR 446.  Holbrook stated that Plaintiff's diagnosed included PTSD, Severe ADHD, predominately Inattentive Type, Chron's Disease and asthma.  AR 446.

Holbrook opined that it would be impossible for Plaintiff to maintain any sort of work schedule because of Plaintiff's inability to focus or maintain any sort of regular schedule and inability to remember appointments.  AR 448.  During 2010 and 2011, Holbrook witnessed Plaintiff's inability to keep appointments as Plaintiff often was late or did not come in because she could not keep track of the days.  AR 448.  Holbrook also observed that Plaintiff's inability to focus during therapy sessions and that it was difficult for Plaintiff to stop talking long enough for them to have a conversation.  AR 448.  Holbrook noted that Plaintiff had improved in these areas since beginning Adderall, a medication prescribed for ADHD, but that the symptoms were "still quite evident."  AR 448.  Holbrook also opined that, due to Plaintiff's anger at and terror of authority figures, it was highly unlikely that Plaintiff could "sustain the kind of instruction and feedback she would have to undergo during training for any job without losing control of her reactions."  AR 448.  Due to those symptoms and Plaintiff's "fear of being predictable due to PTSC [sic]," Holbrook opined that Plaintiff would be unable to meet the requirements of employment.  AR 448.

Holbrook's last appointment with Plaintiff was on August 15, 2013.  AR 1166.  On August 27, 2014, Holbrook completed a Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment.  AR 1162-66.  The form asked for an evaluation of the Plaintiff's abilities in 20 areas, broken into categories for memory and understanding, sustained concentration and persistence, social interaction, and adaptation.  Holbrook opined that Plaintiff had limitations in every area.  She opined that Plaintiff's had severely limited abilities to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being unduly distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent

pace without an unreasonable number and length of rest periods; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, set realistic goals or to make plans independently of others. AR 1163-64. She opined that Plaintiff had moderately severely limited abilities to understand and remember detailed instructions, sustain an ordinary routine without special supervision, interact appropriately with the general public, and accept instructions and respond appropriately to criticism from supervisors. AR 1163-64. She also opined that Plaintiff had moderately limited abilities to remember locations and work-like procedures, understand and remember very short and simple instructions, carry out detailed instructions, make simple, work-related decisions, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the workplace, and be aware of normal hazards and take adequate precautions. AR 1163-64. Finally, she opined that Plaintiff had mildly limited abilities to carry out short and simple instructions, ask simple questions or request assistance, and travel in unfamiliar places or use public transportation.[3] AR 1163-64.

   She opined that Plaintiff had a substantial loss of ability to understand, remember, and carry out simple instructions; make judgments that are commensurate with the functions of unskilled work, i.e., simple work-related decisions; respond appropriately to supervision, co-workers and usual work situations; and deal with changes in a routine setting.[4] AR 1165. She opined that the disability was durable and that the onset was prior to October 2010. AR 1165. She added a comment that Plaintiff had not improved much since she first saw her in October 2010, despite a variety of treatments and medications, and that she saw very little likelihood of Plaintiff's disability improving. AR 1166.

---

[3] The form defined a "mild" impairment as one that "impairs, but does not preclude, the individual's ability to perform the designated activity on a regular and sustained basis, i.e. 8 hours a day, 5 days a week, or an equivalent work schedule." AR 1162 (emphasis omitted).
[4] The form stated that a "substantial loss cannot be precisely defined" but that, "in practical terms, an individual has a substantial loss of ability to perform a basic mental activity when he or she cannot perform the particular activity in regular competitive employment but, at best, could do so only in a sheltered work setting where special considerations and attentions are provided." AR 1165; POMS DI 25020.010(A)(3)(b).

### E. Evelyn Polk, Treating Therapist at the time of the Hearing

Starting January 17, 2014, Plaintiff began therapy with Evelyn Polk, MFT. AR 1276. Between then and September 26, 2014, Plaintiff saw Polk weekly or bimonthly. AR 1276. On September 15, 2014, Polk wrote a letter about her therapy with Plaintiff and completed a medical source statement. AR 1276-80. In the letter, Polk reported that Plaintiff had symptoms of anxiety, panic attacks, insomnia, and nightmares, stemming from reported history of ADD, domestic violence, and Chron's disease. AR 1276. Polk stated that Plaintiff had been "compliant and responsive to treatment planning and interventions." AR 1276. She opined that one of the greatest challenges for Plaintiff had been finding the right balance of medications to treat her symptoms with the least amount of side effects. AR 1276. She stated that Plaintiff's diagnosis consisted of generalized anxiety disorder, PTSD, and Attention Deficit Disorder ("ADD"). AR 1276.

In the medical source statement, Polk opined that Plaintiff did not have significant limitations in most of the 20 activities. AR 1278-79. She did not list any activities for which Plaintiff had a severe or moderately severe limitation. AR 1278-79. She opined that Plaintiff had moderately limited abilities to respond appropriately to changes in the work setting, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and maintain attention and concentration for extended periods. AR 1278-79. Finally, she opined that Plaintiff had mildly limited abilities to understand and remember detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being unduly distracted by them; accept instructions and respond appropriately to criticism from supervisors; travel in unfamiliar places or use public transportation. AR 1278-79.

Polk also opined that Plaintiff had a substantial loss of ability to respond appropriately to supervision, co-workers, and usual work situations. AR 1280. Polk opined that Plaintiff did not have a substantial loss of ability to understand, remember, and carry out simple instructions; make judgments that are commensurate with the functions of unskilled work; or deal with changes in a

routine work setting.  AR 1280.

### F.    Other Records

In October 2010, Plaintiff sought mental health therapy, primarily to help with her PTSD, which she said was affecting every aspect of her life and her ability to do her job.  AR 707.  At the time she was working at a bar and grill, but expected that she would only work there through October 15, 2010.  AR 709.  She stated that she hoped she would be able to work with her sister on a ranch after her job at the bar and grill ended.  AR 709.

In March 2011, Plaintiff had a therapy session with Holbrook.  AR 493. Plaintiff reported that she was taking Adderall for her ADD, and it "was wonderful to be able to focus." AR 493. Plaintiff told Holbrook that, besides the ADD medication, the best thing she had found to help her be calm was working with horses.  AR 493.

## IV.    DISABILITY DETERMINATION FRAMEWORK

The Social Security Administration ("SSA") determines whether a claimant is disabled using a five-step sequential evaluation process.  20 C.F.R. § 404.1520(a)(1).  If, at any step, the SSA is able to determine that the claimant is or is not disabled, the SSA will not proceed to the next step.  20 C.F.R. § 404.1520(a)(4).  At the first step, the SSA determines whether the claimant is engaged in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i).  The claimant is not disabled if she is performing substantial gainful activity.  Id.  At the second step, the SSA determines whether the claimant has a severe physical or mental impairment, or a combination of such impairments, that meets certain durational requirements.  20 C.F.R. § 404.1520(a)(4)(ii).  If the claimant does not have a severe impairment, she is not disabled.  Id.  At the third step, the SSA compares the claimant's impairments to a list of impairments.  20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant's impairments meet or equal one of the listed impairments, she is disabled.  Id.  At the fourth step, the SSA determines the claimant's residual functional capacity ("RFC").  20 C.F.R. § 404.1520(a)(4)(iv).  The RFC is the most the claimant can still do despite her limitations and is based on all the relevant medical data and other records.  Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1097 (9th Cir. 2014).  The SSA compares the claimant's RFC to the claimant's past relevant work ("PRW").  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant can

1    perform her PRW as she performed it or as it is generally performed, she is not disabled. 20

2    C.F.R. § 404.1520(a)(4)(iv); <u>Valencia v. Heckler</u>, 751 F.2d 1082, 1086-87 (9th Cir. 1985).

3    Finally, the SSA compares the claimant's RFC along with her age, education and work

4    experience, to see if she can adjust to other work. 20 C.F.R. § 404.1520(a)(4)(v). If she can

5    adjust to other work, she is not disabled. <u>Id.</u> If not, she is disabled.

6    **V.      ADMINISTRATIVE LAW JUDGE'S DECISION**

7          The ALJ made no finding at step one as to whether Plaintiff had engaged in substantial

8    gainful activity since April 20, 2010, the date of her alleged disability onset. AR 22. However,

9    the ALJ noted that Plaintiff worked after the alleged disability onset as a bartender until sometime

10   in 2011 and as a horse riding instructor from 2009 into 2012. AR 22. At step two, the ALJ found

11   that Plaintiff had the following severe impairments: irritable bowel syndrome, asthma, affective

12   disorders, ADHD, anxiety disorder, PTSD, and histrionic personality disorder. AR 23. He found

13   that she had carpal tunnel syndrome but that it was a non-severe impairment. AR 23. At step

14   three, he ALJ found that Plaintiff did not have an impairment or combination of impairments that

15   met or medically equaled the severity of one of the listed impairments. AR 24. Although Plaintiff

16   describes the ALJ's finding at step one as "troubling," she does not challenge the ALJ's first three

17   findings.

18         At step four, the ALJ found that Plaintiff has the RFC "to perform the full range of

19   medium work as defined in 20 C.F.R. 404.1567(c) and 416.967(c), with the need to avoid

20   exposure to respiratory irritants, and is able to perform simple, repetitive tasks equating to

21   unskilled work." AR 26. In reaching his finding of Plaintiff's RFC, he found that Plaintiff's

22   reports concerning the intensity, persistence, and limiting effects of her symptoms were not

23   entirely credible. AR 27-28. He gave no weight to Holbrook's opinions, weight to some of Dr.

24   Shertock's opinions, little weight to Dr. Tsang's opinions, and weight to Polk's opinions. AR 29-

25   30. The ALJ adopted the state agency's assessment that Plaintiff was limited to unskilled work

26   but rejected any social limitations, noting that "the record, including [Plaintiff's] work with the

27   public after the alleged disability onset beli[ed] significant limitations" in that respect. AR 29.

28         He further found that Plaintiff was unable to perform any of her PRW because her PRW

12

was classified as semi-skilled and Plaintiff was limited to unskilled work. AR 31. Finally, at step five, he applied the Medical Vocational Rules directly and found that she was not disabled. AR 31.

## VI. STANDARD OF REVIEW

The court may not reverse the Commissioner's decision unless it is based on legal error or is not supported by substantial evidence. McCartey v. Massanari, 298 F.3d 1072, 1075 (9th Cir. 2002). If the record as a whole can support either affirming or reversing, the court must affirm. Reddick v. Chater, 157 F.3d 715, 720 (9th Cir.1998). "Substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Molina v. Astrue, 674 F.3d 1104, 1110–11 (9th Cir. 2012) (internal quotations omitted) (quoting Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir.2009)). "The evidence must be 'more than a mere scintilla,' but may be less than a preponderance." Id. (quoting Valentine, 574 F.3d at 690). The court reviews "the administrative record in its entirely to decide whether substantial evidence to support the ALJ's decision exists, weighing evidence that supports and evidence that detracts from the ALJ's determination." Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

Plaintiff does not challenge the ALJ's first three findings. Plaintiff argues that the ALJ erred at step five because substantial evidence does not support his finding that Medical-Vocational Rule 203.29 directed a finding that Plaintiff was not disabled. She also argues that the ALJ erred because the ALJ did not incorporate limitations assessed by Plaintiff's mental health professionals in his RFC finding and did not reject the mental health professionals' opinions by the correct legal standards. Finally, she argues that the ALJ erred because he did not discredit Plaintiff's testimony based upon the correct legal standards.

## VII. PLAINTIFF'S RESIDUAL FUNCTIONING CAPACITY

The ALJ must provide specific clear and convincing reasons for discrediting the testimony of a claimant unless there is a finding of malingering. Burrell v. Colvin, 775 F.3d 1133, 1136 (9th Cir. 2014). Similarly, in "order to reject the testimony of a medically acceptable treating source, the ALJ must provide specific, legitimate reasons based on substantial evidence in the record." Molina, 674 F.3d at 1111. "[W]here the treating doctor's opinion is not contradicted by another

13

doctor, it may be rejected only for "clear and convincing" reasons." <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995) (quoting <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1396 (9th Cir.1991)). Even when another doctor's opinion contradicts the treating or examining doctor's, the ALJ may not reject the opinion without providing specific and legitimate reasons for doing so. <u>Id.</u> at 830-31. "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." <u>Lester v. Chater</u>, 81 F.3d at 834. "In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." <u>Garrison v. Colvin</u>, 759 F.3d 995, 1012–13 (9th Cir. 2014).

A reviewing court**,** however, is "not deprived of [its] faculties for drawing specific and legitimate inferences from the ALJ's opinion." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755 (9th Cir. 1989). In <u>Magallanes,</u> the Ninth Circuit found that the ALJ had not made a required finding explaining why the ALJ was rejecting a doctor's opinion. <u>Id.</u> However, the court determined that it could infer the reasons from the ALJ's "detailed and thorough" summary of the facts and "conflicting clinical evidence" in the case. <u>Id.</u>

### A.     Dr. Tania Shertock, Examining Psychologist

Plaintiff argues that the ALJ improperly rejected Dr. Shertock's opinions because the ALJ provided only boilerplate reasons for rejecting the opinions, without offering a substantive basis for his conclusions. The ALJ gave weight to Dr. Shertock's opinion that Plaintiff would be able to perform simple repetitive tasks, but found that Dr. Shertock's "assessment of additional restrictions" including that Plaintiff "would experience marked limitations in adapting to changes in a routine work-related setting" was "contradicted by the record as a whole, including the results of multiple mental evaluations and the treatment records, as well as the activities discussed." AR 30. The ALJ did not, at that point in his decision, provide citations to the evidence that contradicted Dr. Shertock's opinion.

However, Plaintiff appears to agree that the ALJ is referring to an earlier part of his decision, in which he contrasted the results of Dr. Shertock's April 2013 examination with notes

from Plaintiff's more recent discharge from hospitalizations and various medical appointments. Discharge notes from a June 2013 hospitalization stated that Plaintiff's attitude was cooperative, her behavior was normal, her speech was at a normal rate, her cognition was "grossly intact" and her insight, judgment, and impulse control were "fair." AR 581-82. Notes from an August 2013 mental health appointment included a mental examination of Plaintiff, which mental examination showed that her behavior was "appropriate, cooperative," and included "good eye contact." AR 679. Plaintiff's speech was also at a regular rate, tone, and volume AR 679. Her thought process was "linear" and "logical." AR 679. In February 2014, Plaintiff reported that medication was "generally helpful for her." AR 1035.[5]

Discharge notes from an April 2014 emergency department visit to Kaiser Permanente for syncope and a chin laceration included that her psychiatric condition was "normal mentation/mood/affect, good judgment/insight." AR 889. Notes from a doctor's appointment for joint pains in August 2014 included that Plaintiff's mental status was "alert, oriented to person, place, and time, anxious, very appropriate, good judgement [sic], insight." AR 1116. Plaintiff was hospitalized in August 2014 due to a panic attack, suicidal ideation, and inability to sleep. AR 1134. At the time of admission, she was severely intoxicated. AR 1138. She was discharged the next day. AR 1138. Her discharge notes indicate that her behavior and manner were "pleasant and cooperative," her speech was "normal," her thought process was "logical," her thought content was "normal and goal directed," her attention was "within normal limits," her impulse control, insight, and judgment were "fair." AR 1138. When discussing the weight he gave to Holbrook's opinion, the ALJ referred to several of these notes, stating that they "reflect little abnormality." AR 30. These notes, which were incidental notes to physical treatment for physical conditions or discharge from hospitals for severe psychiatric incidents that had improved with hospitalization, do not provide substantial evidence to disregard an examining doctor's opinion based on the results of several psychological tests. Moreover, while they may generally support the ALJ's finding that Plaintiff's mental impairments were not always severe, they do not specifically

---

[5] This appears to have been a telephone call for a referral to Dr. Tsang, rather than an in person appointment. See AR 1035-36.

contradict any of Dr. Shertock's opinions.

When determining whether Plaintiff's impairments met or equaled a medical listing, the ALJ noted that, in contrast to Dr. Shertock's note that Plaintiff had "significant interpersonal problems," Polk, Plaintiff's therapist at the time of the hearing, had opined that Plaintiff had either no significant limitations or only mild limitations in social interactions.[6] AR 25. Although noting this contradiction, the ALJ did not explain why Polk's opinion was more reliable.

In the same paragraph, he noted that Plaintiff reported that she worked in a bar and grill, which required "substantial interaction with the public," after the alleged onset of her disability. AR 25. He also referred to this work when evaluating Plaintiff's credibility, noting that Plaintiff performed work during her alleged period of disability that was "inconsistent with the allegations of limitations as to social limitations and other restrictions." AR 27. Plaintiff argues that her work activities are not relevant reasons to disregard Dr. Shertock's opinions because she ceased them long before Dr. Shertock's examination and Dr. Shertock's examination was not retrospective. Rep. at 7. It is true that Dr. Shertock conducted several tests to determine Plaintiff's mental status at the time. Nonetheless, Dr. Shertock had to rely on Plaintiff's misleading self-reported work history which notably did not include her bartending or horseback riding jobs, despite purporting to cover the time period in which she held those jobs. See AR 551-55.

Relying on Drouin v. Sullivan, 966 F.2d 1255 (9th Cir. 1992), Defendant argues that the fact that Plaintiff's ability to maintain employment with success during her alleged period of disability demonstrates that Plaintiff's impairments do not completely prevent her from working. 966 F2d. at 1258. Plaintiff replies that there is no inherent conflict between a finding of disability and her horseback riding and bartending work. She relies on Lester, 81 F.3d at 833, in which the court held that "the sporadic ability to work" is not inconsistent with disability and Rodriguez v. Bowen, 876 F.2d 759, 763 (9th Cir. 1989), in which the court held that "the capability to work only a few hours per day does not constitute the ability to engage in substantial gainful activity."

―――――――――――――

[6] Plaintiff's opening brief never mentions Polk, but Plaintiff cites Polk in her reply.

United States District Court
Northern District of California

1    Plaintiff's work is distinguishable from that held not to be inconsistent with disability in

2    Lester and Rodriguez.  Indeed, it exceeds the work that the court found helped establish that the

3    claimant was not disabled in Drouin.  There, the claimant had worked part time at a fast-food

4    restaurant for six months.  966 F.2d at 1256.  She usually worked four hours a day, five days a

5    week.  She also worked at photo film processing lab for a little over a year, but someone lifted

6    carousels of film for her, which would normally have been her job.  Id.  The court held that the

7    fact that the claimant had been able to hold two jobs during her period of disability supported the

8    ALJ's determination that she was not disabled, even if the particular jobs she had held in the past

9    were too taxing for her.  Id. at 1258.   By contrast, Plaintiff worked nine to ten hours a day, six

10   days a week, for two jobs, each for over a year.  AR 231-33.  In her reply, Plaintiff misstates that

11   she performed these activities only six days per month, citing AR 231-33.  Rep. at 7.  The "per

12   month" field, however relates to pay, not days worked.  Id.  While Plaintiff testified that her

13   conditions, including her panic attacks, sometimes interfered with her work, she did not state that

14   she required accommodations to perform her responsibilities.  AR 45-46.  Moreover, the ALJ's

15   reference to Plaintiff's past work activity was tailored to the discussion of her claimed limitations.

16   As the ALJ stated in his decision, Plaintiff's specific work activities showed that she had been able

17   to work in settings that required interacting with the public after her alleged onset of disability,

18   which contradicted the significant social limitations that several of the providers assessed.  See AR

19   29.

20   Whether the ALJ's reasons for rejecting Dr. Shertock's opinions are legally sufficient is a

21   close question.  The paragraph dedicated solely to what weight the ALJ gave to Dr. Shertock's

22   opinion is insufficient standing alone.  The ALJ's decision as a whole included a detailed

23   summary of the medical evidence, as well as summaries of daily activities and an explanation of

24   how they were inconsistent with some of the assessed limitations.   It is possible to find additional

25   reasons for rejecting Dr. Shertock's opinions based on the ALJ's decision as a whole, such as the

26   fact that they contradict the less restrictive assessment of Polk, Plaintiff's therapist at the time of

27   the hearing, and are inconsistent with some of Plaintiff's past activities.  But even those reasons

28   are fairly general.  For example, considering the limited information in the record as to Plaintiff's

1  responsibilities in either position, it is not clear how Plaintiff's ability to perform those jobs

2  undermines Dr. Shertock's specific assessment that Plaintiff "would experience marked

3  limitations in adapting to changes in a routine-work related setting," which the ALJ rejected.  AR

4  30.  Moreover, the ALJ suggested that Dr. Shertock's opinion was inconsistent with the "record as

5  a whole," but Dr. Shertock's opinion was consistent with the opinions of both Dr. Tsang and

6  Holbrook.  Accordingly, the ALJ's reasons for rejecting some of Dr. Shertock's opinions were

7  insufficient.

8  **B.      Dr. Leslie Tsang, Treating Psychiatrist**

9  Plaintiff argues that the ALJ also improperly rejected Dr. Tsang's by providing only

10  boilerplate reasons for rejecting the opinions, without offering a substantive basis for his

11  conclusions.  The ALJ listed the limitations that Dr. Tsang had assessed, including that Plaintiff is

12  "unable to complete  activities of daily living independently and without prompting," "limited in

13  social interaction and communication," was "impaired in task completion due to the severity of

14  her symptoms," and "significantly limited in adaptation to work or work like situations."  AR 30.

15  The ALJ gave Dr. Tsang's opinion "little weight in light of the record as a whole, including the

16  relevant factors discussed, the additional medical evidence, and [Plaintiff's] own testimony

17  regarding activities, including her work after the alleged disability onset."  AR 30.

18  By itself, this paragraph does not satisfy the requirements of Lester and Garrison.

19  However, the ALJ's reference to Plaintiff's work activities is sufficiently specific to explain why

20  the ALJ discounted some of Dr. Tsang's opinions.  When explaining why he was not adopting the

21  state agency's assessment in full, the ALJ found that Plaintiff's ability to work as a bartender and

22  a horseback riding instructor after her alleged onset of disability contradicted the assessment that

23  Plaintiff had significant limitations in interacting with the public.  See AR 29, 130.  Plaintiff

24  argues that her work does not contradict Dr. Tsang's opinions because Dr. Tsang examined her in

25  2014 and she had stopped working as a bartender and horseback riding instructor by then.  See

26  231.  This is not persuasive because Dr. Tsang reported that the onset date of her condition was

27  2008 and did not distinguish in his report between her current conditions and her past ones.  AR

28  689.  Still, the ALJ did not make clear findings as to how fact that Plaintiff was able to perform

work as a bartender and horseback riding is inconsistent with other limitations that Dr. Tsang assessed.

The ALJ did not refer with specificity to the relevant factors and additional medical evidence. However, because the ALJ referred to them throughout his decision, it is fair to infer that he is referring to the medical evidence discussed in section VIII.A, regarding Dr. Shertock's similar opinions. As noted there, because they are evidence that Plaintiff's mental impairments were not always severe, they do provide support generally for disregarding some of the assessed limitations based on Plaintiff's mental impairments. However, the notes do not specifically address any of Plaintiff's work-related abilities. Moreover, these impressions of Plaintiff's mental status, mostly assessed incidentally to other medical issues and without conducting thorough psychological examinations, are not substantial evidence justifying disregarding the opinion of a treating psychiatrist. Thus, the ALJ's reasons for rejecting Dr. Tsang's opinions were insufficient.

### C. Mary Holbrook, MFT Treating Psychotherapy Counselor

Plaintiff argues that the ALJ improperly rejected Holbrook's opinions. Plaintiff relies on the Social Security Decision SSR 06-3p, which provides several factors for considering opinion evidence from medical sources who are not "acceptable medical sources." Those factors include:

> How long the source has known and how frequently the source has seen the individual;
>
> How consistent the opinion is with other evidence;
>
> The degree to which the source presents relevant evidence to support an opinion;
>
> Whether the source has a specialty or area of expertise related to the individual's impairment(s)[;] and
>
> Any other factors that tend to support or refute the opinion.

SSR 06-3p. The adjudicator should also "explain the weight given" to these opinions "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." Id. An ALJ must provide "germane reasons" to discount the opinion of medical source who is not an "acceptable medical source." Popa v. Berryhill, 872 F.3d 901, 907 (9th Cir. 2017) (holding that the ALJ's decision to disregard the

1    opinions of a nurse practitioner who was the only one who had actually treated the claimant made

2    little sense).

3         The ALJ considered several of Holbrook's opinions.  AR 29.  He gave "no weight" to her

4    opinion that Plaintiff was totally disabled and unable to perform any work because a finding of

5    disability is an issue reserved to the Commissioner.   AR 29.  He also noted that she was not an

6    acceptable medical source, "although her assessments are considered based on her relationship

7    with" Plaintiff.  AR 29.  He summarized her opinions from the February 2013 letter.  AR 29.  He

8    gave those opinions "no significant weight" as they were inconsistent with the weight of evidence,

9    including Plaintiff's psychiatric examinations, which reflected little abnormality.  AR 30.  He gave

10   the opinions contained in Holbrook's medical source statement "no significant weight for the

11   reasons discussed" and because the report contained inconsistencies.  AR 30.  Specifically, he

12   noted that Holbrook had opined that Plaintiff had only "mild" limitations in her ability to carry out

13   short and simple instructions but later stated that Plaintiff had a "substantial loss" in her ability to

14   understand, remember, and carry out simple instructions and to make judgments that are

15   commensurate with the functions of unskilled work.  AR 30.

16        Plaintiff argues that the ALJ rejected Holbrook's opinion without considering the factors

17   outlined above.  Mot. at 21.  However, Plaintiff does not establish that the ALJ did not consider

18   these factors, only that the ALJ did not articulate its opinion about each factor.  There is no

19   requirement that the ALJ do so.  As stated in SSR 06-03p, "there is a distinction between what an

20   adjudicator must consider and what the adjudicator must explain in the disability determination or

21   decision."

22        Plaintiff also argues that the ALJ's reasons for rejecting Holbrook's opinions are invalid

23   and not germane.  Plaintiff is correct that it is possible to reconcile Holbrook's assessment of

24   "substantial loss" in response to a question that combined several abilities, including ones for

25   which she had assessed moderate limitations, with her response to a separate question that only

26   addressed Plaintiff's ability to carry out short and simple instructions, although there is some

27   tension between the two.  See AR 1163-64.  Furthermore, the psychiatric evaluations the ALJ

28   provides as examples of evidence inconsistent with Holbrook's opinions are not full psychiatric

20

evaluations. One of them consists of notes from Plaintiff's visit to a Solano County public clinic for stomach and back pain. AR 526-28. The psychiatric notes there are that Plaintiff had an appropriate mood and affect and that she appeared oriented to the time and place. AR 528. Another is from an April 29, 2014, emergency department visit to Kaiser Permanente for syncope and a chin laceration. AR 886-890. The records included a note that Plaintiff's psychiatric condition was "normal mentation/mood/affect, good judgment/insight." AR 889. The final example the ALJ cited is from a Kaiser Permanente clinic on February 26, 2014, at which time Plaintiff reported that her medications were helpful. AR 1035. As stated above, the ALJ opined that this evidence showed that Plaintiff's psychiatric examinations reflected "little abnormality." AR 30. The ALJ does not explain how they are inconsistent with Holbrook's assessments. Reliance on these notes is insufficient to justify rejecting the opinion of a therapist who saw Plaintiff over 20 times and treated Plaintiff over the course of several years.

### D. Plaintiff's Testimony

The ALJ may consider many factors in weighing a claimant's credibility, including

(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid;

(2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and

(3) the claimant's daily activities.

Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996)).

Plaintiff argues that the Court improperly rejected Plaintiff's testimony because he failed to offer specific, clear, and convincing reasons for rejecting Plaintiff's testimony about the severity of her symptoms. The ALJ provided several reasons to support his finding that Plaintiff's testimony was not entirely credible. First, the ALJ noted that the state agency had identified significant inconsistences in Plaintiff's reports. AR 27. For example, Plaintiff gave different descriptions of her work history to different treatment providers. AR 126. She told some providers that she had no history of substance abuse even though she does have a history of substance abuse. AR 126. She told one provider that she had never been to prison when, in fact,

she had been incarcerated several times.  AR 126.

Plaintiff argues that these statements are either unsupported by substantial evidence or not a valid basis to discredit her testimony.  With respect to the inconsistencies in her reports, Plaintiff cites the recent Ninth Circuit case, Trevizo v. Berryhill, 871 F.3d 664, 679, n.5 (9th Cir. 2017), which held that "assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms,' and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness."  871 F.3d at 679 (quoting SSR 16-3p).  At the same time, other recent Ninth Circuit cases have held that the ALJ may consider a claimant's inconsistent statements in assessing her credibility.  Popa v. Berryhill, 872 F.3d 901, 906-07 (9th Cir. 2017).   These inconsistencies provide some, albeit very modest, support for the ALJ's finding that Plaintiff's testimony was not entirely credible.

In any event, the ALJ provided other, more specific and convincing bases for his finding.  The ALJ noted that Plaintiff had stopped working not only because of her impairments but also because her sister moved out of state.  AR 27, citing AR 244.  He also found that Plaintiff's work as a bartender and horseback riding instructor undermined her self-reports about her symptoms because it showed that she was more active from 2009 to 2012 than she generally reported.  AR 27.  The ALJ also found that Plaintiff had been non-compliant with prescribed treatment.  AR 27.  He also noted that one of her therapists had advised her that if she did not show up for another appointment, the therapist would discontinue treatment.  AR 29, AR 483.  The ALJ also wrote that in October 2010, she was working at a bar and grill but hoped to join her sister working on a ranch after the job ended.  AR 28.  Further, in 2011, Plaintiff had a "good vacation with her children in Lake Tahoe."  AR 27.  The ALJ also observed that Plaintiff had reported in March 2011 that Adderall was helping her focus, which is inconsistent with some of Plaintiff's testimony.  AR 28, 493.  These are valid reasons to discount her testimony.

The ALJ also listed many times that Plaintiff had visited a doctor and presented without significant psychiatric abnormalities, as discussed above.  AR 29.  These notes included observations that Plaintiff's mood and affect were normal, her impulse control and judgment were

fair, her behavior was cooperative, and her thought process was linear and logical. AR 581-82, 679, 889, 1035, 1116, and 1138. As explained above, the notes from hospital visits and doctor's appointments do not significantly undermine Plaintiff's reports because they were incidental notes to physical treatment for physical conditions or discharge from hospitals for severe psychiatric incidents that had improved with hospitalization.

With respect to the ALJ's findings regarding Plaintiff's work experience and her family vacation, Plaintiff relies on Garrison, 759 F.3d at 1016. There, the Ninth Circuit warned ALJs against relying on daily activities to discredit the claimant's testimony about pain because the ability to do something in a non-work environment with assistance and breaks was different than being held to a minimum standard of work performance full-time. Id. However, Garrison is distinguishable because Plaintiff here performed as a bartender and horseback riding instructor on a full time basis during her alleged period of disability. While the fact that Plaintiff went on one family trip is not inconsistent with her testimony, the fact that she was able to perform more than full time work, nine hours a day, six days a week, in settings involving significant public interaction, after the alleged onset of disability, is inconsistent with many of Plaintiff's reports regarding the severity of her symptoms.

Plaintiff argues that substantial evidence does not support a finding that she failed to comply with prescribed treatment. The ALJ found that Plaintiff had continued to smoke cigarettes even when directed not to and had discontinued the use of prescription medication. AR 27. Plaintiff argues, unpersuasively, that she was only advised to stop smoking, rather than prescribed to stop smoking. AR 629, 827. Cessation of smoking is not a drug a doctor can prescribe, of course. In July 2013, she was recommended to stop smoking, and she was provided with information about smoking cessation resources. AR 629. In March 2014, she was advised to stop smoking, she discussed the adverse health effects of smoking, and she was offered smoking cessation support. AR 827. The fact that she continued to smoke undermines her reports of the intensity and persistence of her asthma symptoms.

At the same time, the evidence that Plaintiff stopped taking prescription medicine is less significant. While the failure to follow a prescribed course of treatment may undermine a

claimant's subjective testimony about her symptoms, the claimant may have good reasons for doing so. Trevizo, 871 F.3d at 679. In the email to her doctor in which Plaintiff mentioned that she had stopped taking her medicine, she supplied two reasons: she was uncertain what medications the doctor wanted her to take and she stopped some of the medicines due to extreme side effects. AR 880. The ALJ did not make any findings that her reasons were not credible. Plaintiff does not respond to the ALJ's finding that Plaintiff had to be advised that her therapist might discontinue treatment if Plaintiff missed any more appointments. In sum, although a few of the ALJ's stated reasons for discrediting Plaintiff's testimony are not convincing, many of them are, such as the inconsistency between Plaintiff's work activities and her reports of social limitations, and her failure to follow through with treatment. Thus, the ALJ provided clear and convincing reasons to discredit Plaintiff's testimony as to the severity of her symptoms.

### E.     Conclusion

Because the ALJ's rejection of the opinions of Dr. Shertock, Dr. Tsang, and Holbrook were legally insufficient, the Court remands for further proceedings. The Ninth Circuit has set out specific requirements for when a court should remand for benefits rather than for further proceedings:

> Before we may remand a case to the ALJ with instructions to award benefits, three requirements must be met: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." Even if those requirements are met, though, we retain "flexibility" in determining the appropriate remedy. In particular, we may remand on an open record for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act."

Burrell v. Colvin, 775 F.3d 1133, 1141 (9th Cir. 2014) (quoting Garrison v. Colvin, 759 F.3d 995, 1020-21 (9th Cir.2014)).

Plaintiff argues that the ALJ would have been required to find Plaintiff disabled if he had not improperly discredited the testimony of Dr. Shertock, Dr. Tsang, and Holbrook. Plaintiff states that, if credited as true, the testimony of these individuals would establish that Plaintiff is

disabled **so** the appropriate remedy would be a remand for an award of benefits. However, the opinions that Plaintiff is totally disabled are medical conclusions, not legal ones. <u>Harman v. Apfel</u>, 211 F.3d 1172, 1180 (9th Cir. 2000) (remanding for further proceedings even when crediting as true a doctor's opinion that the claimant was totally disabled, in part because it was a "medical rather than a legal conclusion"). "In contrast to other cases in which [courts] have remanded for payment of benefits based upon improper rejection of medical testimony, here there was no testimony from the vocational expert that the limitations found by" Plaintiff's medical sources would render Plaintiff "unable to engage in any work." <u>See id.</u> "In cases where the testimony of the vocational expert has failed to address a claimant's limitations as established by improperly discredited evidence, [the courts] consistently have remanded for further proceedings rather than payment of benefits." <u>Id.</u> Moreover, the ALJ refrained from issuing a finding on step one, whether Plaintiff had performed substantial gainful activity after the alleged onset of her disability. The ALJ could potentially find that Plaintiff is not disabled at that step. Accordingly, the Court remands for further proceedings.

## VIII.  MEDICAL-VOCATIONAL GUIDELINE 203.29

Once the ALJ determines that a claimant cannot perform any of her PRW, the ALJ must determine whether the claimant is able to adjust to other work by considering the claimant's RFC and vocational factors of age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v); 20 C.F.R. § 404.1560(c)(1). The Medical-Vocational Guidelines, Regulations No. 4, Subpart P, Appendix 2 ("grids"), "discuss the relative adjudicative weights which are assigned to a person's age, education, and work experience." SSR 85-15 at *1. The grids consist of three tables of rules that illustrate the interaction of these vocational factors with a claimant's RFC of medium, light, or sedentary work. <u>Id.</u> The rules determine the occupational base of unskilled jobs for individuals whose severe impairments limit their exertional abilities. <u>Id.</u> For example, Rule 201.01 dictates that someone who is limited to sedentary work, is of advanced age, has limited or less education, and unskilled or no work experience is disabled.

The grids only take into account a claimant's exertional limitations. Where a claimant has nonexertional limitations, including mental impairments and environmental restrictions, the ALJ

25

must determine how much the claimant's occupational base is reduced by the effects of the nonexertional limitations. SSR 85-15 at *3. When a claimant's nonexertional limitations include environmental restrictions, the effect on the occupational base will depend on how severe the restriction is. "Where a person has a medical restriction to avoid excessive amounts of noise, dust, etc., the impact on the broad world of work would be minimal because most job environments do not involve great noise, amounts of dust, etc." Id. at *8. By contrast, "[w]here an individual can tolerate very little noise, dust, etc., the impact on the ability to work would be considerable because very few job environments are entirely free of irritants, pollutants, and other potentially damaging conditions." Id. "Where the environmental restriction falls between very little and excessive, resolution of the issue will generally require consultation of occupational reference materials or the services of a [Vocational Specialist]." Id.

The ALJ found that Plaintiff was capable of performing "the full range of medium work . . ., with the need to avoid exposure to respiratory irritants, and [was] able to perform simple, repetitive tasks equating to unskilled work." AR 26. The ALJ also found that Plaintiff met the definition for a younger individual, ages 18-49, because she was 29 old at the date of the alleged onset of disability. AR 31. He found that she had at least a high school education and was able to communicate in English. AR 31. He determined that whether her skills were transferrable was not material because the Medical-Vocational Rules "directly support[ed] a finding of 'not disabled' whether or not [Plaintiff had] transferrable job skills." AR 31. He determined that Rule 203.29 applied to Plaintiff and directed a finding of "not disabled." AR 32. The ALJ stated, "As correctly found by the state agency at Exhibit 6A, the need to avoid respiratory irritants does not significantly erode the occupational base." AR 32, citing AR 129, 132-33.

Plaintiff argues that the ALJ improperly relied on Medical-Vocational Rule 203.29 to determine that she was not disabled. First, she argues that the state agency did not make any findings related to the effect of her need to avoid irritants. It is not clear from the agency's decision exactly how it factored Plaintiff's environmental restrictions into its determination that Plaintiff was not disabled. The agency found that Plaintiff was capable of performing "medium" work. AR 132-33. The agency also found that Plaintiff had environmental restrictions requiring

26

her to "[a]void even moderate exposure to "[f]umes, odors, dusts, gases, poor ventilation, etc." and "[a]void concentrated exposure" to extreme cold. AR 128-29. The agency used Medical-Vocational Guideline 204.00 to "direct a determination or framework." AR 133. However, rule 204.00 is the rule for claimants who can perform "heavy" and "very heavy" work, not claimants who are restricted to "medium" work. The guidelines state that "[e]nvironmental restrictions ordinarily would not significantly affect the range of work existing in the national economy for individuals with the physical capability for heavy work (or very heavy work)." In any case, the ALJ did not rely on the state agency's findings, noting that "Section 204.00 applied when "the claimant has solely non-exertional limitations." AR 32.

Second, Plaintiff argues that the ALJ erred because the ALJ's finding that Plaintiff's RFC included a "need to avoid exposure to respiratory irritants" unambiguously meant that the Plaintiff needed to avoid exposure to respiratory irritants "altogether." See Rep. at 3. The record does not support interpreting the ALJ's RFC finding the way Plaintiff proposes. While the ALJ found that asthma was one of Plaintiff's severe impairments, the ALJ also found that most of the respiratory examinations Plaintiff had undergone since June of 2011 showed that Plaintiff had normal respiratory examinations. AR 28. Moreover, the fact that Plaintiff did not quit smoking despite her asthma, although offered smoking cessation treatments at Kaiser, and that she was able to work for over a year at a bar and grill is strong evidence that her need to avoid respiratory irritants was not as extreme as Plaintiff argues. The ALJ's findings with respect to Plaintiff's asthma provide substantial support for the ALJ's finding that "the need to avoid respiratory irritants [did] not significantly erode the occupational base." AR 32. Accordingly, the ALJ did not err.

Nonetheless, as the Court is remanding this case, the ALJ should revise his RFC finding to clarify to what degree Plaintiff can tolerate respiratory irritants. If the ALJ determines that this requirement falls between "very little" and "excessive," the ALJ should consult a vocational specialist.

## IX. ADDITIONAL EVIDENCE SUBMITTED TO APPEALS COUNCIL

Plaintiff submitted a Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment, completed by Dr. Tsang to the Appeals Council. Dr. Tsang

completed the form on August 14, 2015.  He assessed her as having severely limited abilities in all 20 work-related areas and substantial losses in all four abilities.  Pltf. Ex. A.  Although his first visit with Plaintiff was in March 2014, Dr. Tsang opined that the date of the onset of disability was 2012.  Pltf. Ex. A at 4.

In the Appeals Council's letter denying Plaintiff's request for a review of the ALJ's decision, the Appeals Council stated that it looked at "the treating source statement of Leslie Aaron Tsang, D.O., dated August 14, 2015."  AR 2.  The Appeals Council stated, "The Administrative Law Judge decided your case through May 20, 2015.  This new information is about a later time.  Therefore, it does not affect the decision about whether you were disabled beginning on or before May 20, 2015."  AR 2.  The Appeals Council did not include Dr. Tsang's August 2015 statement in the administrative record for appeal.

Plaintiff argues that the Appeals Council erred because it improperly declined to review Dr. Tsang's medical source statement on the grounds that it covered a period after the ALJ's decision.[7]  Plaintiff points out that, while Dr. Tsang completed the statement itself in August 2015, which was after the ALJ's decision,  Dr. Tsang listed the "date of onset the foregoing limitations" as "2012; my first visit 3/2014."  Ex. A at 4.  Accordingly, the report was about Plaintiff's limitations from, at the earliest 2012, or at the latest, March 2014 through August 2015.   Thus, according to Plaintiff, the Appeals Council was mistaken when it determined that Dr. Tsang's statement would not affect the decision about whether Plaintiff was disabled beginning on or before May 20, 2015, the date of the ALJ's decision.  It is not clear that this Court has jurisdiction to review the Appeals Council's exclusion of the evidence.  See Cherry v. Berryhill, No. C16-5866RSL, 2017 WL 750307, at *1 (W.D. Wash. Feb. 27, 2017).

In any case, this Court may not consider this extra-record evidence.  Plaintiff argues that under Ramirez v. Shalala, 8 F.3d 1449, 1452 (9th Cir. 1993), the court should consider this evidence and, because the Appeals Council's reason for rejecting the report was improper, credit the report as true under Lester, 81 F.3d at  834.  However, in Ramirez and other cases since then,

---

[7] Defendant does not respond at all to Plaintiff's argument about the Appeals Council's failure to consider the evidence from Dr. Tsang.

the reviewing court considered additional evidence submitted to the Appeals Council when the Appeals Council had already examined the entire record, including the new evidence, affirmed the ALJ after considering the case on its merits, and *made the new evidence part of the record.* Id.; see also Harman, 211 F.3d at 1180;  Williams v. Colvin, 24 F. Supp. 3d 901, 909 (N.D. Cal. 2014); Warner v. Astrue, 859 F. Supp. 2d 1107, 1110 (C.D. Cal. 2012).  Plaintiff does not cite any authority that allows a reviewing court to consider evidence that is not included in the transcript of the record.  In Social Security cases, the Commissioner files the transcript of the record with the court as part of her answer to the claimant's complaint.  42 U.S.C. § 405(g).  "[J]udicial review of an ALJ's decision may only be based "'upon the pleadings and transcript of the record.'" Cherry, 2017 WL 750307, at *1 (quoting 42 U.S.C. § 405(g)).  There is no procedure by which the court itself may amend the administrative record.  Id.  Accordingly, the Court has not reviewed the evidence attached to Plaintiff's motion.  Because the court is remanding this case to the agency for further proceedings, however, the ALJ should consider this evidence from Dr. Tsang.[8]

## X.      CONCLUSION

The Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's motion for summary judgment, and **REMANDS** for further proceedings.  The Court **DENIES** Defendant's cross-motion for summary judgment.

**IT IS SO ORDERED.**

Dated:  March 30, 2018

_Elizabeth D. Laporte_
ELIZABETH D. LAPORTE
United States Magistrate Judge

---

[8] Plaintiff also submitted the results of an MRI on her cervical spine, which was performed on June 16, 2015, to the Appeals Council.  Pltf. Ex. B.  She does not address what effect, if any, consideration of that evidence would have on the disability determination, but the ALJ **should** consider that evidence on remand as well.